**In re LABRUM & DOAK, LLP
a Pennsylvania General
Partnership, Debtor.**

**Official Committee of Unsecured Creditors, on Behalf of the Estate of Labrum & Doak, a Pennsylvania General Partnership, Plaintiff,**

v.

**Perry S. Bechtle, Gerard Bruderle, Leslie M. Cyr, Carl R. Fogelberg, Albert E. Hart, Jonathan Herbst, James D. Hilly, Barbara L. Hollenbach, Mary M. Jacobs, William F. Keating, Douglas J. Kent, J. Stephen Kreglow, Michael H. Krekstein, John F. Ledwith, John D. Lucey, Jr., Edwin F. Mccoy, Kean K. Mcdonald, William J. Mckee, Scott H. Mustin, James M. Neeley, Peter J. Neeson, Samuel J. Pace, Jr., David J. Parsells, Daniel J. Ryan, John E. Salmon, John J. Seehousen, Paul M. Silver, Stephen J. Springer, Robert J. Stern, Robertson B. Taylor, Ronald J. Uzdavinis, Patrick R. Vitullo, John L. White, Merle A. Wolfson, Patricia And Luciano Lopes, Alliance**

Consulting Group Associates, Inc., The Hill School, Charles C. Watson and John Does, 1 Through 100, The latter Being Fictitious but Intending to Designate Persons or Legal Entities of any Kind Whatsoever Who or Which Have, May Have, or Purport to Have Any Claims of Any Kind Against Any or All of the Debtor's Former or Current Partners, Either in their Capacities as Former or Current Partners of Debtor or Based Upon Any Alleged Liability for Obligations of the Debtor or its Estate, Defendants.

Official Committee of Unsecured Creditors, on Behalf of the Estate of Labrum & Doak, a Pennsylvania General Partnership, Plaintiff,

v.

Perry S. Bechtle, Gerard Bruderle, Leslie M. Cyr, Carl R. Fogelberg, Albert E. Hart, Jonathan Herbst, James D. Hilly, Barbara L. Hollenbach, Mary M. Jacobs, William F. Keating, Douglas J. Kent, J. Stephen Kreglow, Michael H. Krekstein, John F. Ledwith, John D. Lucey, Jr., Edwin F. McCoy, Kean K. McDonald, William J. McKee, Scott H. Mustin, James M. Neeley, Peter J. Neeson, Samuel J. Pace, Jr., David J. Parsells, Daniel J. Ryan, John E. Salmon, John J. Seehousen, Paul M. Silver, Stephen J. Springer, Robert J. Stern, Robertson B. Taylor, Ronald J. Uzdavinis, Patrick R. Vitullo, John L. White, Merle A. Wolfson, Defendants.

Bankruptcy No. 98–10215DAS.
Adversary Nos. 99–0082, 99–0083.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Aug. 3, 1999.

Neal D. Colton, Philadelphia, PA, for debtor.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Plan Administrator.

Paul Winterhalter, Philadelphia, PA, for Former Committee of Former Partners.

Joseph M. Toddy, Zarwin, Baum, De-Vito, Kaplan & O'Donnell, P.C., Philadelphia, PA, for Home Insurance Cos.

James E. O'Neill, III, Stradley Ronon Stevens & Young, LLP, Philadelphia, PA, for Defendant Robert J. Stern.

Robert J. Lenahan, Adelman Lavine Gold and Levin, Philadelphia, PA, for Defendant John D. Lucey, Jr.

John Seehousen, Langhorne, PA, for Kevin Wright, defendant pro se.

Jonathan Herbst, Margolis Ledelstein, Philadelphia, PA, defendant pro se.

James D. Hilly, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, defendant pro se.

Leslie M. Cyr, Dugan Brinkman Maginnis Pace, Philadelphia, PA, defendant pro se.

Carl R. Fogelberg, Fogelberg & Assoc., New York City, defendant pro se.

James M. Neeley, c/o Marcia P. Neeley, New York City, defendant pro se.

Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Kean McDonald.

Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for Perry Bechtle & Daniel J. Ryan in Adv. 98–0861.

Shawn J. Lau, Bingaman, Hess, Coblentz & Bell, Reading, PA, for defendants Lopes.

J. Scott Victor, Saul, Ewing, Remick Saul, LLP, Philadelphia, PA, for defendants Scott H. Mustin and Michael H. Krekstein.

Robert Szwajkos, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for defendant Hollenbach.

Nicholas J. Lepore, III, Schnader Harrison Segal & Lewis, Philadelphia, PA, for defendants Perry S. Bechtle & Daniel J. Ryan.

James M. Matour, Middleman & Matour, Philadelphia, PA, for defendant Samuel J. Pace, Jr.

Joseph Diorio, Philadelphia, PA, for defendants Peter J. Neeson, John E. Salmon, & Stephen J. Springer.

John A. Macoretta, Berry & Martin, Philadelphia, PA, for defendants Bruderle, Kent, Ledwith, McCoy, McKee, Silver & Vitullo.

Robert Lapowsky, Stevens & Lee, P.C., Philadelphia, PA, for defendant David J. Parsells.

Michael F.J. Romano, Woodbury, NJ, for defendant Ronald J. Uzdavinis.

Lewis G. Adler, Woodbury, NJ, for creditor.

Jonathan J. Bart, Philadelphia, PA, for Alliance Consulting Group, Inc.

David A. Eisenberg, Allentown, PA, for defendant Robertson B. Taylor.

Robert D. Sayre, Philadelphia, PA, for defendant Albert E. Hart.

Frederick Baker, Ass't U.S. Trustee, Philadelphia, PA, trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant Opinion has two important aspects. Firstly, it endeavors to resolve all of the matters outstanding, at least at this trial level, in the contentious Chapter 11 bankruptcy case of a dissolved law partnership, LABRUM & DOAK, LLP ("the Debtor"). As a result, the within Order effecting our decisions schedules a status hearing to set tentative dates for completion of the plan implementation process and entry of a Final Decree in this case. Secondly, it addresses two important legal issues: (1) the extent of personal liability of the law partners ("the Defendant Partners") who have not settled with the Plan Administrator ("the Administrator") on account of the Debtor's deficiency to non-partner creditors; and (2) whether we should enter a post-confirmation injunction preventing the Debtor's creditors from pursuing any of the Debtor's partners in other forums in the future on account of the Debtor's liability to them.

We hold, under applicable Pennsylvania partnership law, that the Defendant Partners, having failed to provide evidence of any sort of notice to creditors of the Debtor of their withdrawal from the Debtor or of their entering into an agreement regarding same are liable for all obligations arising after as well as during the duration of their partnership with the Debtor, although we find that the deficiency is not tremendously large and that one partner is not liable for any obligations which preceded her participation. We also hold that, in light of the limited opposition to same and its importance to the settlements effected, the entry of the requested injunction is most significant in effectuating the confirmed plan and is appropriate.

Our decisions combine to leave the Defending Partners in a worse status than the many settling partners. However, we attribute this result to the intransigence of

the Defendant Partners. Unless the Defendant Partners are able to vindicate themselves on appeal, they would certainly be well-advised to attempt to join the ranks of the settling partners in light of these decisions.

## B. *PROCEDURAL AND FACTUAL HISTORY*

Presently before us is the disposition of three matters arising in the Debtor's case. The first is Adversary No. 99–0083 ("the Deficiency Proceeding") instituted by the Administrator, created as a successor to the Official Committee of Unsecured Creditors ("the Committee") in the Debtor's case, pursuant to the terms of the Debtor's confirmed Chapter 11 liquidation plan ("the Plan"), of which the Committee was the proponent. The Deficiency Proceeding seeks to obtain a declaratory judgment that the Debtor's partners and former partners are jointly and severally liable for any deficiency of the Debtor's estate, to fix those deficiencies, to obtain an injunction protecting the Debtor's partners from any other litigation on account of the deficiencies, and an accounting of their assets from all partners. The second is Adversary No. 99–0082 ("the Injunction Proceeding"), also instituted by the Administrator, to obtain a temporary restraining order ("TRO"), preliminary injunction ("PI"), and permanent injunction preventing any purported creditors of the Debtor from pursuing any of the Debtor's partners on account of their personal liability as partners in any other forums in the future. The third matter is a number of objections ("the Objections") by the Administrator to all of the proofs of claim filed by the Debtor's partners and former partners in the Debtor's bankruptcy case.

Although the Complaints in the Proceedings name thirty-four (34) partners and former partners, and the Injunction Proceeding includes as defendants these former partners and several named and unnamed nonpartner creditors as well, it has been reported that settlements have been negotiated with all of the Defendants in both Proceedings except (1) LESLIE M. CYR, a partner who is now counsel to the law firm of Dugan, Brinkmann, Maginnis & Pace; (2) CARL R. FOGELBERG, a partner located in the Debtor's former New York City office who is now doing business in the same location as the law form Fogelberg & Associates, P.C.; (3) JONATHAN HERBST, a former partner now affiliated with the law firm of Margolis Edelstein; (4) JAMES D. HILLY, a former partner who is now a shareholder in the law firm of Marshall, Dennehey, Warner, Coleman & Goggin, P.C.; (5) JOHN D. LUCEY, JR., a partner now employed at the law firm of Schubert, Bellwoar, Cahill & Quinn, P.C.; (6) JAMES M. NEELEY, a former partner now associated with the United States Department of State who is presently in Europe or Asia; (7) JOHN J. SEEHOUSEN, a former partner now working as a sole legal practitioner in Langhorne, Pennsylvania; (8) ROBERT J. STERN, a partner now affiliated with the law firm of Stradley, Ronon, Stevens & Young, LLP; and (9) HOME INSURANCE COMPANIES ("Home"), the only non-partner creditor who has not settled with the Administrator. Of the foregoing, only Seehousen and Herbst were involved in most of the court proceedings. Cyr, Fogelberg, and Stern appeared only as witnesses called by the Administrator. Hilly and Home both appeared briefly on their own behalfs. Lucey appeared only by counsel. Neeley, who it was noted is in the eastern hemisphere, never appeared.

The procedural history of the Debtor's main bankruptcy case from its filing as an involuntary Chapter 7 case by Seehousen and five other former partners of the Debtor on January 6, 1998, through our last decision of March 11, 1999, reported only at 1999 WL 138875 (*"Labrum VII"*), is recited in *Labrum VII* and had been reiterated through the dates of many prior reported decisions made necessary because this case has been contentious and

marked by a significant volume of litigation. Other Opinions published in the Bankruptcy Reporter to date include:

(1) a decision of July 30, 1998, allocating tax recapture liability arising from the lease of the Debtor's former Philadelphia office among its former and present partners, reported at 222 B.R. 749 (*"Labrum I"*);

(2) a decision of August 14, 1998, reported at 225 B.R. 93 (*"Labrum II"*), supplemented by a further decision of October 19, 1998, reported at 226 B.R. 161 (*"Labrum III"*), allowing the Debtor to obtain a *quantum meruit* recovery of the fees ultimately received by its former attorneys who took the Debtor's contingent-fee cases with them;

(3) a decision of November 13, 1998, reported at 227 B.R. 372 (*"Labrum IV"*), approving most aspects of the Committee's Plan. The Plan was ultimately confirmed in a slightly-amended form on December 2, 1998;

(4) a decision of November 19, 1998, dismissing an unsuccessful § 547(b)(3) action brought against partners receiving 1997 dividends from the Debtor, reported at 227 B.R. 383 (*"Labrum V"*).

(5) a decision of December 4, 1998, allowing the Debtor to recover a portion of post-dissolution income generated by recoveries by its former partners in non-contingent fee matters and cases of the Debtor taken with them, reported at 227 B.R. 391 (*"Labrum VI"*).

Nine other decisions arising out of this case, many of which decided pre-trial motions in the various proceedings in this case, appear on Westlaw.

A comprehensive history of this case could obviously be gleaned from reading all of the foregoing Opinions, an exercise in which no one is likely to engage. For purposes of the matters before us, we therefore reiterate a few pertinent facts, beginning with the Debtor's status as a respected law partnership engaged in practice for over ninety-three years. On June 5, 1997, the Debtor's remaining partners voted to dissolve the firm, effective July 31, 1997, and on the latter date the firm ceased its practice. This case was converted by the Debtor to a Chapter 11 case on January 22, 1998. The Plan, confirmed on December 2, 1998, provided that the Administrator was authorized to maintain the Deficiency Proceeding post-confirmation. *See Labrum VII*, 1999 WL 138875, at *2; and *Labrum IV*, 227 B.R. at 375–76, 378–79. On January 28, 1999, we entered an Order directing the Administrator to file the Deficiency Proceeding and any other form of relief ancillary thereto by February 8, 1999.

The Administrator did indeed file the Deficiency Proceeding on that date, accompanying same with the Injunction Proceeding as well. The Deficiency Proceeding Complaint contains four Counts. The first seeks a declaration that the Administrator, pursuant to the Plan, has the right to recover from each of its partners and former partners named any amount necessary to satisfy all the Debtor's liabilities to its general nonpartner creditors. The second seeks a determination that the amounts due are property of the partnership pursuant to 15 Pa.C.S. § 8362, and property of the Debtor's estate pursuant to 11 U.S.C. § 541. The third requests limited injunctive relief and is duplicative of the Injunction Proceeding in that respect. The fourth requests an accounting of the assets and liabilities of each partner and former partner. The Injunction Proceeding seeks to enjoin any further lawsuits or executions on judgments against the Debtor's partners and former partners in connection with claims based on their alleged deficiency liability on claims against the Debtor or which are based on services performed by them for the Debtor. Filed in conjunction with the Injunction Proceeding was a motion requesting the TRO and PI. We summarily denied the

TRO and scheduled the PI hearing on February 24, 1999.

At that hearing, we were advised that several of the Defendant Partners and nonpartner creditors had already reached accommodations with the Administrator. *See Labrum VII*, at *4. At the same time, none of the creditor Defendants in the Proceedings reported any imminent trial dates of actions against the Debtor's partners in other forums. *Id.* In fact, there was no· indication that any activity would occur in any of these suits prior to the scheduled trials of the Proceedings on March 17, 1999. Therefore, we could not justify the entry of any PI order. *Id. See NutraSweet Co. v. Vit–Mar Enterprises, Inc.*, 176 F.3d 151, 153–54 (3d Cir.1999); and *In re Beverage Enterprises, Inc.*, 1997 WL 177352, at *3–*4 (Bankr.E.D.Pa. April 7, 1997). On March 17, 1999, we somewhat reluctantly entered an Order granting the parties' request for a continuance and rescheduled the trials of the Proceedings for April 21, 1999, recognizing that resolution of the Proceedings was most likely the final major activity in the case and would . drive most of the other outstanding matters to resolution.

The trial of the Deficiency Proceeding was conducted on April 21, 1999, and April 23, 1999. Settlements with more of the Defendant partners and nonpartner creditors were reported at the outset of the trial and many more during the trial. The aggregate value of these settlements reportedly will result in net proceeds of $625,246.00. Most of these settlements were duly approved by us in an Order of June 23, 1999. We also noted that two additional Defendant Partners, Mary M. Jacobs and William F. Keating, had previously filed their own personal bankruptcies which discharged their deficiency obligations. We also note that objections to the Injunction Proceeding filed by non-partner creditors Athena Assurance Company, Patricia and Luciano Lópes, and the Alliance Consulting Group were withdrawn during the course of the trial. As previ-

ously stated, only Cyr, Fogelberg, Herbst, Hilly, Lucey, Neeley, Seehousen, and Stern remain as active Defendant Partners, and Home is the only active nonpartner creditor.

The Administrator called, as witnesses, all of the Defendant Partners except Lucey and Neeley; Peter J. Neeson, John E. Salmon, and Stephen J. Springer, three very successful former partners of the Debtor who have become partners in the law firm Rawle & Henderson, LLP; Kean K. McDonald, a former partner of the Debtor now affiliated with the law firm of Fox, Rothschild, O'Brien & Frankel, LLP ("the Fox Firm"); and, at great length, George L. Miller, a senior accountant at Miller, Tate & Company, as its sole expert witness. Settling Defendant McDonald provided direct testimony and called Jacqueline M. Carolan, a former "non-equity" partner of the Debtor now also affiliated with the Fox Firm. Active Defendant Partners Seehousen and Herbst offered . lengthy testimony *pro se*.

The Administrator also filed an Omnibus Objection to all proofs of claim filed by partners and former partners of the Debtor on February 12, 1999. The hearings on the Objections, which were reported as related to the Proceedings, were continued, at the time of the start of the Deficiency Proceeding trial, until May 5, 1999. At that time, Miller, Herbst, and Seehousen testified briefly, the latter on behalf of himself and a non-Defendant claimant, former partner Kevin H. Wright. Finally, the trial of the Injunction Proceeding was conducted on May 19, 1999. Neeson, Miller, and (very briefly) Seehousen testified. Herbst and Seehousen briefly cross-examined Neeson and Miller.

We should also note that, on May 4, 1999, Seehousen, on behalf of himself and Wright, and Herbst filed a motion to "correct" the classification of their claims in the Plan. At that point, these parties apparently became painfully aware that, since they were classified as "former partners" under the Plan, their claims were

subordinate to the claims of general unsecured creditors. *See Labrum IV,* 227 B.R. at 376–79. As a result, they realized that their claims would be paid only if the deficiency owed to general unsecured nonpartner creditors which was established to exist in the course of the trial of this Proceeding, *see* pages 301–304 *infra,* and which the Deficiency Proceeding was instituted to collect, were paid off in full. In other words, only if the Deficiency Proceeding were rendered moot, by reason of payment of the entire claim of deficiency, would their claims be paid. Seehousen and Herbst argued, essentially, that, since their claims pre-dated the Debtor's dissolution, it was unfair to classify them with other subordinated classes of partners' claims.

This motion was listed for a hearing on May 19, 1999, and was denied on that date in a brief unappealed order. We could conceive of no basis whatsoever for effectively modifying the Plan to narrow the Plan class definitions including *all* former partners at the request of former partners such as Seehousen and Herbst who had only recently, long after the time for objecting to the Plan had expired and the Plan had been confirmed, ascertained how these definitions impacted on their claims. This decision indicates the practical reason why it is unnecessary for us to decide the particulars of the Objections before us. *See* pages 308–309 *infra.*

After the completion of these trials and the hearing on the Objections, the parties agreed that the Administrator's brief addressing all of the outstanding issues would be submitted by June 18, 1999, and that any parties so desiring would file their opposing briefs by July 6, 1999. Seehousen, Home, Herbst, Cyr, Hilly, and Stern filed briefs in descending order as to length and complexity.

In its brief, the Administrator, pointing out that the Plan specifically authorized it to pursue the Proceedings and Objections, asserts that each of the Defendant Partners, irrespective of when they joined or left the Debtor as partners, is jointly and severally liable for the entire deficiency due to general unsecured nonpartner creditors of the Debtor's estate, *i.e.,* all classes senior to the classes of partners' interests. Then, the Administrator purportedly applied our analysis in *In re CS Associates,* 160 B.R. 899, 910–11 (Bankr.E.D.Pa.1993), *aff'd,* 167 B.R. 368 (E.D.Pa.1994), and calculated the amount of the deficiency at issue. As to the Injunction Proceeding, the Administrator contended that, under 11 U.S.C. § 105(a), this Court had the authority to grant the injunction requested and must do so to effect the settlements which are the foundation of the fruits of its administration of this case under the factors applied for entering similar injunctions in many other cases, several of which also involved professional partnerships. Finally, the Administrator maintains that the Objections should be sustained because all of the partner claimants except Wright are Defendant Partners in the Proceedings on the grounds of 11 U.S.C. § 502(d) and because the claimants, particularly those who failed to attend or present any evidence on May 5, 1999, failed to meet their burdens of proof to sustain same.

Home begins its brief opposing the injunctive relief sought by the Administrator by observing that this relief was not provided for in the Plan. It further argues that, while there may be ample authority for entry of such injunctive relief in professional partnership cases prior to confirmation of plans and in furtherance of reorganizations in the text of plans, there is no precedent for the entry of a post-confirmation injunction such as is sought in the Proceedings by the Administrator.

Seehousen, supplementing his earlier Memorandum supporting his motion to modify the Plan which we already denied on May 19, 1999, vigorously argues numerous points, including the following: (1) the Deficiency Proceeding is barred by the determination that the Debtor was not proven to be insolvent in *Labrum V;* (2) the Administrator's release of the primari-

ly liable partners bars any action against alleged secondarily liable partners such as himself, particularly with respect to claims based on the malpractice of other partners; (3) a finding of a deficiency against him would be inappropriate because most of the Debtor's liabilities arose after he withdrew from the Debtor in 1992; (4) he is entitled to setoff; (5) a seemingly self-defeating contention that the Administrator failed to make a case for the granting of the injunctive relief in favor of any of the individual partners liable for the deficiency, which we ultimately hold includes him; and (6) a contention that, even if they would not be paid, his and Wright's proof of claims should not be disallowed since he defended same on May 5, 1999.

Herbst similarly asserts that he is liable for only his pro rata share of general business debts incurred while he was a partner of the Debtor, which ended with his resignation on January 23, 1996. He also argues that any malpractice (and/or sexual harassment) liability incurred is extinguished by *res judicata*, waiver, and/or release; and that he is entitled to set off his own claims, in which he obtained an arbitration verdict against the Debtor in the amount of $128,000, against any liability of his own. He did not oppose the injunction.

Cyr argues that her liability is limited to obligations arising after she first became a partner of the Debtor on February 1, 1993. She devotes considerable effort to advancing a proposition that, because she worked part-time and received less compensation than "non-equity" partners who were not general partners, *see Labrum II*, 225 B.R. at 104, she was a general partner in "name only" and she should not therefore be treated for liability purposes as a partner. Although it is difficult to see the benefit of this contention to her interests, how it is self-serving, but Cyr "reluctantly" objects to the injunction because it would adversely affect her articulated claims for contribution and indemnification against her co-partners. Finally, Cyr asserts that her

proof of claim should not be subject to challenge because she was not served with notice of the Objections or the hearing on them. We note, however, that her correct name and address are listed on the "Notice of the Objection to Claims and Hearing Date" accompanying the Omnibus Objection.

Hilly simply contends that the Administrator is precluded from imposing any liability upon him for any deficiency incurred subsequent to his dissociation from the Debtor on December 31, 1995. Stern argues only one point, an issue ignored by the other opposing parties: that the Administrator's calculation of the deficiency was incorrect.

## C. DISCUSSION

1. *Having Failed to Provide the Requisite Notice of Their Withdrawal to All Partnership Creditors, the Defendant Partners Are Liable for All Deficiency Claims Arising Subsequent to Their Becoming Partners of the Debtor, Irrespective of Whether They Withdrew from the Debtor Before the Particular Claims Arose.*

A very difficult issue is presented in ascertaining whether withdrawing former partners of the Debtor are liable for *all* of the Debtor's deficiency, even those obligations which arose after their withdrawal. The determination of this issue requires interpretation of several principles of general partnership law, 15 Pa.C.S. §§ 8327, 8358 and 8362 of the Pennsylvania Uniform Partnership Act ("PAUPA"), which read as follows:

§ 8327. **Nature of liability of partner**

All partners are liable:

(1) Jointly and severally for everything chargeable to the partnership under sections 8325 (relating to wrongful act of partner) and 8326 (relating to breach of trust by partner).

(2) Jointly for all other debts and obligations of the partnership but any part-

ner may enter into a separate obligation to perform a partnership contract.

## § 8358. Effect of dissolution on existing liability of partner

**(a) General rule.**—The dissolution of the partnership does not of itself discharge the existing liability of any partner.

**(b) Agreement.**—A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business.

. . .

## § 8362. Rules for distribution

In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:

(1) The assets of the partnership are:

 (i) The partnership property.

 (ii) The contributions of the partners necessary for the payment of all liabilities specified in paragraph (2).

(2) The liabilities of the partnership shall rank, in order of payment, as follows:

 (i) Those owing to creditors other than partners.

 (ii) Those owing to partners other than for capital and profits.

 (iii) Those owing to partners in respect of capital.

 (iv) Those owing to partners in respect of profits.

. . .

(4) The partners shall contribute, as provided by section 8331(1) (relating to rules determining rights and duties of partners), the amount necessary to satisfy the liabilities, but if any, but not all, of the partners are insolvent or, not being subject to process, refuse to contribute, the other partners shall contribute their share of the liabilities and, in the relative proportion in which they share the profits, the additional amount necessary to pay the liabilities. . . .

There is little doubt that, under the provisions of the Plan, the Administrator has been authorized to pursue the Proceedings. *See Labrum VII*, at \*3–\*4; and *Labrum IV*, 227 B.R. at 379–80. More controversial is the Administrator's assertion that each of the Partners is jointly and severally liable for the entire deficiency of the Debtor's estate. To support this argument, the Administrator observes that, under Pennsylvania law (1) partners are liable for any wrongful act or omission of any partner, citing 15 Pa.C.S. § 8325, and (2) partnerships are liable for any breach of trust of any given partner, citing 15 Pa.C.S. § 8326. *See also TPS Technologies, Inc. v. Rodin Enterprises, Inc.,* 816 F.Supp. 345, 350 (E.D.Pa.1993) ("all general partners . . . are liable for the debts and obligations of the partnership"); and *In re Malone,* 74 B.R. 315, 319 (Bankr.E.D.Pa. 1987) ("general partners are personally liable for partnership debts"). Further, the Administrator cites a long line of cases interpreting 11 U.S.C. § 723(a) in support of these principles, notably *In re Massetti,* 95 B.R. 360, 365 (Bankr.E.D.Pa.1989); *In re Riverside–Linden Investment Co.,* 85 B.R. 107, 113 (Bankr.S.D.Cal.1988), *aff'd,* 99 B.R. 439 (9th Cir. BAP 1989); *In re Comark,* 53 B.R. 945, 947 (Bankr.S.D.Cal. 1985); and, *In re I–37 Gulf Ltd. Partnership,* 48 B.R. 647, 649 (Bankr.S.D.Tex. 1985). It then purports to apply our analysis in *CS Associates, supra,* 160 B.R. at 910–11, calculate the amount of the deficiency.

As we noted at page 287 *supra,* the Partners who left the Debtor prior to its dissolution, namely Seehousen, Herbst, and Hilly, vigorously contest the notion that they are accountable for liabilities which arose after they withdrew from the Debtor. The fact that each asserts different arguments and authorities attests to

the lack of clear authority in this area. We will consider each of their arguments in turn and then turn to several authorities not cited by any of the interested parties as the basis for our decision.

Beginning with Seehousen's arguments, we consider his contention that the instant Proceeding is barred by *res judicata* arising from this Court's Opinion in *Labrum V.* The argument is joined by Herbst. According to them, we held in that Opinion that the Debtor was solvent as of December 31, 1996. Thus, they contend that the Administrator's present contentions that the deficiencies at issue originated in 1992 constitute an improper collateral attack on our prior ruling.

A lawsuit constitutes a collateral attack on a previously entered judicial decree if it attempts to avoid, defeat, or evade, or otherwise attempts to deny the prior decree's force and effect; thus, a subsequent lawsuit attempts a collateral attack if it seeks in some manner to overrule a previous judgment. *See Kurz v. Mairone,* 1987 WL 11926, at *3 (E.D.Pa. May 29, 1987), quoting *Miller v. Meinhard–Commercial Corp.,* 462 F.2d 358, 360 (5th Cir.1972). We find the Administrator's contentions that the deficiency presently at issue includes obligations which originated in 1992 in no sense avoids, defeats, evades, or denies the validity of our prior ruling in *Labrum V.* In *Labrum V* we held that the plaintiffs failed to demonstrate, based on the evidence and testimony submitted at that trial, that the Debtor was insolvent between January 7, 1997, and May 1997. 227 B.R. at 387–90.

The present deficiency arises due to events occurring after May 1997. The most "expensive" event which has intervened is the filing of this bankruptcy case, in light of the huge administrative costs which it has generated, and the fact that it prompts all potential claimants and creditors to assert and file their claims. Seehousen, as a petitioning creditor, is a particularly inappropriate party to complain about the administrative costs that "his"

case has generated. However, we can also point to his actions and those of Herbst in expending hours of the time of the Administrator's counsel and witnesses in the instant trials and hearing of the matters presently before us which were, for the most part, successfully and therefore justifiably prosecuted by the Administrator. Seehousen, *et al.* of course had numerous predecessors among the former and present partners in making vain attempts to assert rights in various proceedings and contested matters in this court. John Brown, Edwin McCoy, and Thomas Kaczka are a few that come to mind. These assertions, while they were and are perfectly within the rights of these parties to set forth, were, not surprisingly, expensive to litigate. The Administrator and its predecessor Committee spent many, many hours settling and finally litigating the Debtor's rights when parties, at least initially, refused to settle.

We also note that claimants against the Debtor were identified in the trials of these matters which either had not surfaced when *Labrum V* was tried or were overlooked by the plaintiffs in that action. To cite just one example which would have been decisive, if the malpractice claims of over $30 million which, although now settled, had been cited in the record in *Labrum V,* a different result may well have ensued.

Seehousen makes other arguments which are joined in large part by Herbst and also by Hilly. He asserts that, except for the malpractice deficiency claims which occurred in 1992, he should have no liability for any other alleged deficiency because those deficiency claims originated after he ceased being a partner of the Debtor. This argument is also made, as to claims arising after their somewhat later departure from the status of partners of the Debtor, by Herbst and Hilly. Seehousen further contends that, since the Administrator failed to establish at trial that any malpractice did in fact occur, he is not liable for any of the alleged malpractice

deficiency claims. Further, Seehousen discusses at length a group of partnership liability cases, predominantly *Levy v. First Pennsylvania Bank, N.A.*, 338 Pa.Super. 73, 82–84, 487 A.2d 857, 862–63 (1985); *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 220–21, 560 A.2d 1380, 1383 (1989); and, *Pallante v. Harcourt Brace Jovanovich, Inc.*, 427 Pa.Super. 371, 377–78, 629 A.2d 146, 149–50 (1993), in support of a contention that partners are neither jointly nor severally liable for malpractice claims. As to such claims, Seehousen suggests that the partner guilty of the malpractice is primarily liable for the same, while the partnership and the partners not guilty of malpractice themselves are only secondarily liable. Since the Administrator, in the cause of the settlement process, released the partners who were allegedly primarily liable for the claims at hand, Seehousen concludes that the Administrator is precluded at this stage from pursuing any action against the alleged secondarily liable partners. Thereafter, Seehousen presents two additional reasons why the malpractice deficiency claims must fail:

(1) all such claims were fully covered under the Debtor's malpractice insurance policy. As a result, the Debtor's only potential liability would be for the excess between the amounts claimed by the plaintiffs and the $10,000,000 in coverage available to the Debtor; and

(2) the malpractice claims are now moot because those claims were settled by the Administrator during the course of the trial.

Then, Seehousen relying on *O'Brien & Gere Engineers, Inc. v. Taleghani*, 525 F.Supp. 750, 760 (E.D.Pa.1981), *aff'd*, 707 F.2d 1394 (1983) ("The terms of each obligation must ... be determined and only upon those terms will each partner be liable to a third party ..."), asserts that the Administrator's failure to establish the relative proportions in which the partners shared their profits makes it impossible to determine the amount that each partner would have to contribute to satisfy the deficiency at issue. Finally, Seehousen observes that, even if he had any liability to the Debtor, that liability would be subject to setoff under 11 U.S.C. § 553.

Similarly, Herbst cites 15 Pa.C.S. § 8313 and asserts that he is not liable for deficiency claims incurred after his dissociation from the Debtor in 1996. Next, Herbst, like Seehousen, relies on *O'Brien & Gere, supra*, 525 F.Supp. at 760, in support of the contention that he is liable for only his proportionate share of the deficiency claims incurred while he was a partner of the Debtor and in addition cites to different provisions of the Partnership Act relating to partners' liabilities, particularly 15 Pa.C.S. § 8362(4), but also 15 Pa.C.S. §§ 8327(2), 8331(1), and 8362(5), in support of his position. Further, Herbst argues that, pursuant to the doctrines of *res judicata*, waiver and release, he is not liable for any of the deficiency incurred. To support this argument, Herbst maintains that

(1) the arbitration proceeding between him and the Debtor encompassed all issues between the parties. Therefore, the Administrator's instant deficiency claims against him are barred by *res judicata*.

(2) section 19.7(c)(i) of the Debtor's Partnership Agreement allowed the Debtor's executive committee, in its discretion, to determine what portion or amount of any loans, lease obligations, pending claims, and excepted losses were to be assessed against a withdrawing partner. The Defendant's arbitration claim against the Debtor afforded the latter an opportunity to affirmatively raise any such discretionary claims. Nevertheless, the Debtor's executive committee never exercised its discretion pursuant to this provision. As a result, all such claims are waived against him;

(3) the malpractice deficiency claims against the Defendant are based on the *respondeat superior* theory of

liability. *Levy, supra,* 338 Pa.Super. at 83, 487 A.2d at 863, quoting *First National Bank of Altoona v. Turchetta,* 407 Pa. 511, 181. A.2d 285 (1962). Therefore, in seeking contribution, the Administrator must prove (i) the Defendant's liability to the malpractice claimants, (ii) that the settlement amounts are fair and reasonable, and (iii) the Defendant's percentage share of liability, citing; *Slaughter v. Pennsylvania X–Ray Corp.,* 638 F.2d 639 (3rd Cir.1981); and *Craigie v. General Motors Corp.,* 740 F.Supp. 353 (E.D.Pa. 1990); and *Childers v. Power Line Equipment Rentals, Inc.,* 452 Pa.Super. 94, 681 A.2d 201 (1996). The Administrator has offered no such proof;

(4) a release of one tortfeasor releases all others. *Mamalis, supra,* 522 Pa. at 218, 560 A.2d at 1382; *Pallante, supra,* 427 Pa.Super. at 377, 629 A.2d at 149. Since the active tortfeasors have been released, Herbst claims that, since he is secondarily liable, he must also be released.

Then, Herbst observes that any amounts found to be due and owing by him are subject to setoff against the sums due and owing by the Debtor to him per the arbitration award.

Hilly, in making an argument similar at core to those of Seehousen and Herbst, relies solely on *In re Judiciary Tower Associates,* 175 B.R. 796, 820 (Bankr. D.D.C.1994), in support of his contention that, upon withdrawal, a partner is not personally liable for the debts incurred by the partnership thereafter. As a result, Hilly asserts that the Administrator is precluded from imposing any liability upon him for any deficiency incurred subsequent to his dissociation from the Debtor in December, 1995.

■ We conclude that the Administrator's assertion that the Defendant Partners are liable for all of the deficiencies of the Debtor are correct. Pennsylvania law clearly provides that general partners are liable for the debts and obligations of the partnership. 15 Pa.C.S. §§ 8325, 8326. *See Bruin Holdings, Inc. v. Orianna Historic Associates,* 1995 WL 682788, at *1 (E.D.Pa. Nov. 14, 1995); *TPS Technologies, supra,* 816 F.Supp. at 350; *Sports Factory, Inc. v. Chanoff,* 586 F.Supp. 342, 348 (E.D.Pa.1984); and *Malone, supra,* 74 B.R. at 319. *See also* S. Wickouski, *Going Under,* 18 AUG Pa.Law. 12, 14 (1996) ("partners are . . . fully liable to the partnership for the full amount of unsatisfied partnership debt"). That is, partners are jointly and severally liable for any wrongful act or breach of trust accomplished by a given partner acting within the scope of partnership business and they are jointly liable for all other debts and obligations owed by the partnership itself. 15 Pa.C.S. §§ 8327(1), 8327(2).

■ The fact that Pennsylvania law imposes joint liability upon all partners for all other debts and obligations of the partnership means quite simply that each partner is liable for the full amount of each partnership debt. As a result, each partner has the right to insist that every other partner be joined in a judicial proceeding to enforce that outstanding debt. A. Bromberg, *Enforcement of Partnership Obligations—Who is Sued for the Partnership,* 71 NEB.L.REV. 143, 146–47 (1992) ("In joint liability, all the joint parties (partners) must be sued . . . In joint and several liability, all the parties may be sued together, or, . . . any one or more may be sued separately or together"). The Administrator was therefore serving this requirement when he joined all of the partners, including Seehousen, Herbst, and Hilly, in the Deficiency Proceeding. Consequently, all of the Defendant Partners can be held liable for the full amount of each debt owed by the partnership. *Id.* at 160 ("[U]nder joint liability, each partner is considered liable for the full amount of the contract, although the plaintiff is entitled to only one satisfaction"). *See also CS Associates, supra,* 160 B.R. at 909;

and 59A AM.JUR.2d, § 639, at 555–56 (1987 & Supp.1997).

We note the Administrator's contentions that similar reasoning has been applied in a long line of cases arising in Chapter 7 cases under 11 U.S.C. § 723(a), cited at pages 288–289 *supra.* While § 723 of course does not apply to Chapter 11 cases, courts and commentators alike have concluded that, while § 723 may not be applicable in a Chapter 11 case, the Chapter 11 estate nevertheless may include a cause of action against partners for required contributions. There is, then, no reason why concepts developed in § 723 cases cannot be applied in Chapter 11 deficiency cases as well. See J. Sarnet & C. McLeod, *Select Current Issues in Partnership and Partner Reorganization and Bankruptcy Cases,* 767 PLI/Comm 877, 893 (1998). *See also,* J. Kozyak, C. Throckmorton, & P. Russin, *Partnership Bankruptcy: Liability of Partners and Related Issues,* 359 PLI/Real 515, 524 (1990) (cited hereinafter as "Kozyak").

To support this contention, the Administrator relies on *CS Associates, supra,* 160 B.R. at 908 ("[P]artners are generally ultimately responsible for any deficiency of their partnership"); and *Massetti, supra,* 95 B.R. at 365 ("[T]o the extent that partnership claims exceed partnership assets, 'a general partner . . . is liable to the partnership's trustee for any deficiency . . .' "), quoting H.R.REP. NO. 95–595, 95th Cong. 1st Sess. 381 (1977), U.S.CODE CONG. & ADMIN.NEWS 1978, at 5787, 6337, and concludes that the reasoning applied in those cases is applicable to the instant Proceedings because § 723 is merely a codification of the application of existing state law. *See Massetti, supra,* 95 B.R. at 365 n. 7 ("[G]eneral partners are . . . liable, under state law, for partnership debts . . . [S]ubsection 723(a) did not create obligations of a general partner not otherwise found in non-bankruptcy law"). *See also In re Union Meeting Partners,* 165 B.R. 553, 576 (Bankr.E.D.Pa.1994), *aff'd,* 52 F.3d 317 (3rd Cir.1995) ("a suit by

a Chapter 7 trustee under § 723(a) is nothing more than a contribution action"); and Kozyak, *supra,* 359 PLI/Real at 521 ("each partner is jointly and severally liable without regard to his ability to repay his personal creditors").

■ *In re Litchfield,* 135 B.R. 797, 802 (W.D.N.C.1992), holds that

under South Carolina law, the debtor [is] empowered to compel its general partners to pay the debts of the debtor partnership and . . . under Code § 541(a), this power [becomes] property of the estate upon the filing of the debtor's bankruptcy case.

Applying the reasoning of this decision to the issues at bar, we believe that the laws of Pennsylvania, like those in South Carolina, empower a debtor to pursue an action against the general partners to compel them to pay all partnership debts for the benefit of all its creditors. This power is set forth in §§ 8331 and 8362 of PAUPA, which provide in pertinent part as follows:

**§ 8331. Rules determining rights and duties of partners**

The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(1) . . . each partner must contribute toward the losses, whether of capital or otherwise, sustained by the partnership . . .

**§ 8362. Rules for distribution**

In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:

(1) The assets of the partnership are:

 (i) The partnership property.

 (ii) The contributions of the partners necessary for the payment of all liabilities . . .

(5) The partners shall contribute, as provided by section 8331(1) . . . the amount necessary to satisfy the liabilities . . .

*See also* 15 Pa.C.S. § 8362(5) of the PAUPA ("[a]n assignee for the benefit of creditors ... [has] the right to enforce the contributions [from partners required by § 8331(a)]"). Under 11 U.S.C. § 544(a)(1), the trustee stands in the shoes of am assignee for the benefit of creditors and thus can enforce such rights for the benefit of all creditors.

█ Under Pennsylvania law, therefore, the assets of the partnership include "contributions of the partners necessary for the payment of all liabilities ..." Two provisions of the PAUPA, 15 Pa.C.S. §§ 8331(1), 8362(4), empower the Administrator in the instant Proceeding to compel each partner to contribute to the losses of the partnership. *See also In re Notchcliff Associates,* 139 B.R. 361, 370–71 (Bankr. D.Md.1992); *Litchfield, supra,* 135 B.R. at 803–04; and 6 COLLIER ON BANKRUPTCY ¶ 723.02[1], at 723–5 (15th ed. rev.1999) ("[this section gives] a partnership ... the right to compel contributions from [its] ... partners"). Like all property existing prior to bankruptcy, the partnership's pre-petition property interest in "contributions of the partners necessary for the payment of all liabilities" and chose in action against the partners passes to the partnership bankruptcy estate under Code § 541(a) and may be enforced by the Administrator to the extent of any deficiency of the Debtor's property to satisfy the claims of creditors. *See* 3 NORTON BANKR.L. & PRAC.2d, § 70:3, at 70–4 (1999) and G. Smith, *Issues in Partnership and Partner Bankruptcy Cases and Reorganization of Partnership Debtors,* CA86 ALI–ABA 639, 723–25 (1996).

█ As to the specific contentions presented by Seehousen, Herbst, and Hilly that their respective withdrawals limit their respective liabilities to pre-withdrawal obligations, we note that PAUPA does not address the effect of dissociation on future liabilities. *See* 15 Pa.C.S. § 8358. PAUPA was modeled after the Uniform Partnership Act of 1914, 6 U.L.A. §§ 238–1011 (1995) ("the UPA"). The UPA also does not address the effects of dissociation. At the most, the UPA, § 36, like § 8358 of PAUPA, suggests that dissolution does not have any effect on the existing liability of any given partner. Accordingly, under these strictures, Seehousen, Herbst, and Hilly would be liable for the deficiencies incurred regardless of the fact that some of the deficiency claims at issue arose after their dissociation from the Debtor partnership.

█ The reasoning behind this conclusion is as follows. A partner may be discharged from any existing liability upon dissolution by an agreement to that effect between himself, the partnership creditor, and the person or partnership continuing the business. *See* 15 Pa.C.S. § 8358(b); and UPA § 36(2). *See also* 59A AM. JUR.2d, *supra,* § 906, at 684. During the trials of the Proceedings, none of the active Defendants submitted into evidence, nor testified of the existence of, any such agreement. As a result, we can only conclude that no such agreement existed, and that therefore Seehousen, Herbst, and Hilly are liable for all of the deficiencies at hand.

Conscious of these consequences, the drafters of the Revised Uniform Partnership Act of 1996 ("RUPA") tried to clarify the effects of dissociation of partners from a partnership. *See* UPA, 6 U.L.A. §§ 1–127 (1998). *See also* A. Wensinger, *The Revised Uniform Partnership Act Breakup Provisions: Stability or Headache?,* 50 WASH. & LEE L.REV. 905, 930 (1993). For this reason, RUPA § 703, which corresponds somewhat to the UPA, § 36, provides as follows:

SECTION 703. DISSOCIATED PARTNER'S LIABILITY TO OTHER PERSONS.

(a) A partner's dissociation does not of itself discharge the partner's liability for a partnership obligation incurred before dissociation. A dissociated partner is not liable for a partnership obligation incurred after dissoci-

ation, except as otherwise provided in subsection (b).

(b) A partner who dissociates without resulting in a dissolution and winding up of the partnership business is liable as a partner to the other party in a transaction entered into by the partnership, or a surviving partnership under Article 9, within two years after the partner's dissociation, only if at the time of entering into the transaction the other party:

(1) reasonably believed that the dissociated partner was then a partner;

(2) did not have notice of the partner's dissociation; and,

(3) is not deemed to have had knowledge under Section 303(e) or notice under Section 704(c).

However, as of this date, RUPA has been only adopted in nineteen jurisdictions. J.D. Hynes, *Notice and Notification Under the Revised Uniform Partnership Act: Some Suggested Changes*, 2 J. SMALL & EMERGING BUS. LAW. 299, 316 n. 1 (1998). Pennsylvania is *not* one of them. Moreover, assuming *arguendo* that RUPA did indeed apply in this jurisdiction, we would be forced to arrive at the same conclusion. Section 703(b) of RUPA simply states that a dissociated partner is not liable for partnership obligations incurred after dissociation, *only if* at the time the partnership enters into a given transaction with a third party, the party in question had notice of the dissociation. *See* RUPA, § 703(b)(2). Again, none of the Defendant Partners submitted any evidence or testimony that any notice of their withdrawal from the Debtor was provided to creditors of the Debtor.

Although Pennsylvania case law is scarce on these issues, it is important to note that dated, but viable and therefore controlling, Pennsylvania cases arrived at similar conclusions when facing analogous problems. In *New York Nat'l Exchange Bank v. Crowell*, 177 Pa. 313, 322, 35 A. 613, 614 (1896), the court noted that

"[t]he well-settled rule is that notice of the dissolution of a partnership given in a newspaper printed in the city or county where the partnership business is carried on is of itself sufficient notice to all persons who have not had previous dealings with the partnership, so as *to relieve a withdrawing partner from liability for debts subsequently contracted* in the name of the firm without his consent, express or implied." (emphasis added).

There is no indication that the Defendant–Partners resorted to the seemingly easy recourse of publication notice of their dissociation from the Debtor.

In a similar vein in *Robinson v. Floyd*, 159 Pa. 165, 173, 28 A. 258, 259–60 (1893), the court observed that,

[i]n *Watkinson v. Bank*, 4 Whart. 482, [484–85 (Pa.1839) ], it is said: "The question presents itself in this case, what is sufficient notice of the dissolution of a partnership, so as to discharge a partner from debts *subsequently* contracted in the name of the firm without his participation or assent? The rule seems to be that notice of the dissolution of partnership given in the newspaper printed in the city or county where the partnership business is carried on, is of itself notice to all persons who have had no previous dealings with the partnership, but, as to persons who have had such previous dealing with the partnership, it is not sufficient." In the 50 years that have passed since that decision, *that rule has been invariably applied in this class of cases* (emphasis added).

Finally, in *Shamburg v. Abbott*, 112 Pa. 6, 13, 4 A. 518, 520 (1886), the Court held that,

[b]y reason of his neglect to give notice of his withdrawal, plaintiff *became liable to pay debts* which, ... were not his own, but the personal debts of those who continued to compose the firm, and, as partners, contracted them after he had

withdrawn from the association (emphasis added).

■ In the instant factual setting the Defendant Partners presented no evidence of their having provided any notice of their dissociation from the Debtor to any of the Debtor's creditors. Moreover, no evidence was submitted to support the conclusion that any of these parties were discharged from any liability by an agreement to that effect between themselves, the partnership creditors, and/or the Debtor. Accordingly, they remain liable for all of the deficiencies at issue, even those which arose after they withdrew as partners from the Debtor.

There is nothing novel about these conclusions. Courts in other jurisdictions confronted with similar dissociation problems have held that, absent requisite third-party notices and an agreement between the partners and the partnership itself, partners remain liable for debts incurred by the partnership after dissociation. As it has been variously put:

> On the dissolution of a partnership by the withdrawal or retirement of a partner, the outgoing partner sustains no further relation to the remaining or continuing partners whereby they can exercise any authority binding on him, in the absence of circumstances giving rise to estoppel. Thus, a partner is not personally liable for partnership debts where the partnership is dissolved before the inception of the debts, at least where notice of the dissolution is given to third parties who have dealings with the partnership.

*MacKay v. Hardy*, 973 P.2d 941, 945 (Utah 1998).

> [G]eneral partners are liable for the tortious acts of their co-partners that are performed in the course of partnership business ... While former partners may, under certain circumstances, still be liable for acts of their co-partners, even those committed after the withdrawing partners' departure from the partnership, liability in such a situation results only from insufficient notice of withdrawal.

*Colli v. Wirth*, 1995 WL 704966, at \*1 (S.D.N.Y. Nov. 30, 1995).

> The failure to provide actual notice of withdrawal by a general partner is clearly sufficient to impose liability under partnership and agency principles.

*State v. Beehive Limited Partnership*, 89 Ohio App.3d 718, 727, 627 N.E.2d 592, 599 (1993), quoting *Baltzell–Wolfe Agencies, Inc. v. Car Wash Investments*, 58 Ohio App.2d 70, 389 N.E.2d 517 (1978).

> A partner is discharged from any existing liability ... by an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business ...

*Wester & Co. v. Nestle*, 669 P.2d 1046, 1047–48 (Colo.App.1983).

> [The withdrawing partner] was discharged from his liability [only] if there was an agreement to that effect between himself, the remaining partners, and [a partnership creditor;] and such agreement may be inferred from course of dealing between the remaining partners and the creditor who has knowledge of the dissolution agreement.

*White v. Brown*, 292 F.2d 725, 727 (D.C.Cir.1961), citing *Dunbar v. Steiert*, 31 Ariz. 403, 253 P. 1113 (1927); *International Harvester Co. of America v. Layton*, 148 Ark. 156, 229 S.W. 22 (1921); *LeGault v. Lewis–Zimmerman*, 28 Wyo. 474, 206 P. 157 (1922); and LINDLEY ON PARTNERSHIP 316–18, 323–26 (11th ed.1950), and cases cited therein.

*Levy*, cited by Seehousen; *O'Brien & Gere*, cited by both Seehousen & Herbst; and 15 Pa.C.S. § 8362(4), invoked by Herbst alone, do not contradict the principles established by the foregoing authorities. *Levy* was an unsuccessful appeal by a bank held liable for honoring an errant partner's withdrawal of client funds into his personal account. The issue before the court was not the extent of other partners' liabilities for the errant partner's actions.

The court's statements, e.g., "[t]he statutes in question would appear to impose liability on a partnership, and on individuals comprising the partnership, without regard to fault when a partner causes a client's loss," 338 Pa.Super. at 82, 487 A.2d at 862, are not suggestive of a limitation on "innocent" partners' liabilities. See also In re Summit Airlines, Inc., 160 B.R. 911, 920 (Bankr.E.D.Pa.1993) (citing Levy as supporting extensive liability of partners for partnership debts).

The most pertinent passage from O'Brien & Gere is the following, 525 F.Supp. at 760:

It is axiomatic that the personal assets of each partner are at risk for the satisfaction of the obligations of the partnership. 59 Pa.Cons.Stat.Ann. § 327 (Purdon Supp.1980). However, this rule does not operate to deprive partners of the benefits of their bargains. The terms of each obligation must still be determined and only upon those terms will each partner be liable to a third party to the extent of the joint obligation or his personal wealth.

It is difficult to see how this passage supports a limitation on withdrawing partners' liabilities.

■ Similarly, 15 Pa.C.S. § 8362(4), quoted at page 288 supra, apparently assuming the willingness and ability of all partners to satisfy a deficiency, limits the share of partners' liabilities to their shares of profits received. However, it recites no limitation on liabilities relative to the withdrawal of the partner from the partnership. A search of Pennsylvania case law and other secondary sources interpreting this statutory provision or any other provision of PAUPA did not reveal any authority supporting the notion that this section was intended as a limit on the liability of a general partner to third parties. Compare Kozyak, supra, 359 PLI/Real at 521 ("each partner is ... liable without regard to his ability to repay his ... creditors"); and A. Bromberg, supra, 71 NEB.L.REV. at 160 ("each partner is liable for the full amount of the contract"). Rather, a review of the following relevant commentary to § 8362 thusly indicates that its only purpose was to address the allocations of the liabilities of the partners inter se:

the "bottom line" result under general partnership law as in effect in Pennsylvania and most other jurisdictions is that if a negligent or intentionally wrongful act were committed by any general partner in the course of the partnership's business and the available insurance and partnership assets were insufficient to satisfy the claim, any general partner could be called upon to satisfy as much as all of the deficiency and the effective rights of contribution would be limited by the personal assets of the other partners.

H.S. Bryans & R. Shields, Registered Limited Liability Partnerships for the Practice of Law in Pennsylvania, 66 PA. BAR ASS'N Q. 79, 81 (1995). Furthermore, the adoption of Herbst's reading of § 8362(4) would tend to circumvent the bankruptcy purpose of equal and orderly distribution of a debtor's assets. Creditors of a partnership are entitled to rely upon the clear state-law principle that generally partners are ultimately responsible for any deficiency of their partnership. See CS Associates, supra, 160 B.R. at 908.

Hilly's citation of Judiciary Square is more relevant. That court does state as follows, 175 B.R. at 820:

As set forth above, absent compliance with D.C.Code § 41–135, withdrawal from a partnership does not release a former partner from liability for the existing debts of the partnership. However, once a partner withdraws, he or she is not personally liable for the debts incurred by the partnership thereafter. In apparent recognition of this fact, the Trustee has now indicated an intent to withdraw his claim against Bramlett on account of the Pepco and M & B Ceramic Tile claims. See trustee's Reply, DE # 106, p. 24. The court sees no reason

why this same logic does not free Bucheit, who withdrew before Bramlett, from any liability for these two claims, and so will deny judgment against Bucheit on account of these claims (emphasis added).

However, conspicuously absent from this statement of the *Judiciary Square* court, which appears near the end of a long Opinion and therefore in the nature of a quick wrapping-up of loose ends, is the absence of any authority, even under District of Columbia ("D.C.") law under which that matter was decided, in support of the statement emphasized above. Arguably this holding is inconsistent with the same court's earlier, carefully-reasoned conclusions expanding the liabilities of the partners in question. *Id.* at 802, 806–11. Finally, however, irrespective of the law of D.C. on this point, we are obliged to follow the Pennsylvania law directly on point which we cited and quoted from at pages 294–295 *supra.*

We need also consider, at least briefly, the remaining arguments of Seehousen and/or Herbst relating to the malpractice claims for which they might be deemed liable. We do note, at the threshold of addressing these arguments, that these claims will be paid from insurance benefits and therefore are largely removed from our computation of the deficiency due at pages 301–304 *infra.* Nevertheless, at this point, we address and find without merit on their face Seehousen's arguments that (1) the Administrator failed to establish at trial that any malpractice did in fact occur; (2) the malpractice claims at issue were fully covered by insurance; and (3) the malpractice claims in question are now moot by reason of settlement.

■ In a deficiency action, the plaintiff simply has to show that there is, without question, a deficiency in the property of the estate. *In re Super 8 Florida III, Ltd.,* 211 B.R. 764, 765 (Bankr.M.D.Fla. 1996); *In re Bell & Beckwith,* 112 B.R. 863, 870 (Bankr.N.D.Ohio 1990); and *Monetary Group, supra,* 55 B.R. at 298. *See*

*also* Kozyak, *supra,* 359 PLI/Real at 521 ("To establish a deficiency, the trustee must either have (i) collected the assets of the estate and liquidated them, or (ii) satisfactorily proved the value of the assets"). Needless to say, this is what the Administrator did prove at the trials of the Proceedings.

■ We note that, as an interested party, Seehousen could have joined the Administrator in its objection to the malpractice claims or any other of the claims now challenged by him. As it developed, the Administrator obtained, with court approval in the absence of objections after notice, resolution of these claims. That the claims which make up the deficiency may have been covered by the Debtor's malpractice insurance policy and were settled during the course of the trial by no means affects or releases Seehousen in any way from the established claim of liability. As noted earlier, partners are liable for the debts and obligations of the partnership: *See* 15 Pa.C.S.A. §§ 8325, 8326. *See also Bruin Holdings, supra,* 1995 WL 682788, at *1; *TPS Technologies, supra,* 816 F.Supp. at 350; *Sports Factory, supra,* 586 F.Supp. at 348; *Malone, supra,* 74 B.R. at 319; and A. Bromberg, *supra,* 71 NEB.L.REV. at 160 ("each partner is considered liable for the full amount of the contract"). As a matter of fact, however, these claims do not appear to be considered in our computation of the deficiency at pages 301–304 *infra.* However, Seehousen, like the other partners of the Debtor, would be liable for any deficiency incurred from the Debtor's malpractice liabilities.

■ Similarly, the arguments presented by Seehousen and Herbst that they are only secondarily responsible for malpractice claims; that the releases of the primarily responsible parties extinguishes, as a matter of law, these potential claims against them; and that they are solely liable for their proportionate share of the deficiency claims incurred, are incorrect.

First of all, their understanding of the *respondeat superior* theory of recovery is misguided. As we noted in *Summit Airlines, supra,* 160 B.R. at 918, regarding a law firm's liability in the context of a principal-agent relationship,

> [t]he Comment and examples to § 261, [RESTATEMENT (SECOND) OF AGENCY] at 571, make it absolutely clear that (1958) ... respondeat superior liability exists even where the principal is entirely innocent of involvement in the agency's actions and has derived no benefit therefrom.

The reason behind this principle is that every partner is an agent of the partnership and the act of every partner in the scope purpose of the partnership's business binds the partnership. *See Henkels & McCoy, Inc. v. Adochio,* 138 F.3d 491, 503 n. 10 (3d Cir.1998); and *In re Elsub Corp.,* 66 B.R. 172, 181 (Bankr. D.N.J.1986) ("Pursuant to this principle, every member of a partnership is liable for torts which are committed by other members of the partnership."). It has long been settled under the law of Pennsylvania that a partnership and every member thereof is liable for the losses occasioned by one of its members acting within the scope of the firm's business, even though the persons sought to be charged did not participate in, ratify, or have knowledge of that conduct. *See Summit Airlines, supra,* 160 B.R. at 919. *See also In re Direct Satellite Communications, Inc.,* 96 B.R. 507, 524 (Bankr.E.D.Pa.1989); *First Nat'l Bank v. Turchetta,* 407 Pa. 511, 512, 181 A.2d 285, 287–88 (1962); and *Guillou v. Peterson,* 89 Pa. 163, 172 (1879). These principles are incorporated, in specific terms, in §§ 8325, 8326, and 8327 of PAUPA. *See Palomba v. Barish,* 626 F.Supp. 722, 724 (E.D.Pa.1985) ("Pennsylvania law is clear that the negligence of one partner acting in the ordinary course of business of the partnership will be imputed upon the non-acting partners, making the non-acting partners ... liable for the negligence"). Applying the foregoing structures, we conclude that, regardless of the labels used (primarily, secondarily, *etc.*), the Defendant Partners, as former partners of the Debtor, are liable for the deficiencies at hand.

With respect to the release issue, it is well settled under Pennsylvania law that the effect of a given release is to be determined by the ordinary meaning of its language. *See Wolbach v. Fay,* 488 Pa. 239, 242, 412 A.2d 487, 488 (1980); and *Hasselrode v. Gnagey,* 404 Pa. 549, 551–52, 172 A.2d 764, 765 (1961). Thus, a party who signs a general release waiving all claims and discharging all parties will be precluded from thereafter suing a party who did not contribute consideration toward the release. *See Buttermore v. Aliquippa Hospital,* 522 Pa. 325, 328–29, 561 A.2d 733, 735 (1989). However, the rule that the release of one releases all is inoperative where the parties in writing evidence a contrary intent. *Baker v. AC&S, Inc.,* 729 A.2d 1140, 1147–48 (1999). In the instant Proceedings, the Administrator's settlement stipulations did not contemplate the release of non-signatories to the agreements. The release of the alleged malpractice claimants therefore did not purport to operate as a release of the partners, and hence does not have this effect.

As to Herbst's contentions regarding the doctrines of *res judicata* and waiver arising from the fact that he prosecuted his claims in a pre-petition arbitration proceeding, we conclude that same are inapplicable to the instant Proceeding. The claim-preclusive aspect of *res judicata* requires a showing by the Defendant that there has been (1) a final judgment on the merits; (2) a prior suit involving the same parties or their privies; and (3) a subsequent suit based on the same cause of action. *See, e.g., Board of Trustees v. Centra,* 983 F.2d 495, 504 (3rd Cir.1992); *Napier v. Thirty or More Unidentified Federal Agents,* 855 F.2d 1080, 1086 (3rd Cir. 1988) *Williams v. Lehigh County Dept. of Corrections,* 19 F.Supp.2d 409, 411

(E.D.Pa.1998); and *Waltman v. Fahnestock & Co., Inc.*, 792 F.Supp. 31, 32 (E.D.Pa.1992). Stated another way, for the doctrine of *res judicata* to apply, the essential inquiry is whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties had an opportunity to appear and assert their rights. *See Callery v. Municipal Authority of Blythe Twp.*, 432 Pa. 307, 312, 243 A.2d 385, 387 (1968).

■■■ Applying these criteria to the instant Proceeding, we conclude that the doctrine of *res judicata* is inapplicable here. Herbst's arbitration proceeding obviously did not involve the Administrator, nor was the Debtor, in that proceeding, acting in the capacity of the administrator or as a liquidating agent of claims against it. Hence, the cause of action at issue there, apparently simply the validity of Herbst's claim, was not at all the same as that at issue here. The elements of a voluntary, knowing, and intelligent waiver of rights to a deficiency against Herbst by the Debtor in that proceeding, *see, e.g., In re Car–Gill Inc.*, 125 B.R. 133, 137 (Bankr. E.D.Pa.1991), were not in any sense made out here, either.

■■■ Finally, we believe that Seehousen's and Herbst's assertions regarding the Code's setoff provisions have no merit. The Bankruptcy Code, at 11 U.S.C. § 553, preserves a creditor's right to set off only certain mutual obligations between it and a debtor. This section states, in relevant part, as follows:

### § 553. Setoff

(a) Except as otherwise provided in this section and in [§ ] 362 ... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

As a result, in order for the Defendants to establish their right of setoff, they must demonstrate that

(1) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case;

(2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case; and

(3) the debt and the claim are mutual obligations.

*See, e.g. United States Through Agricultural Stabilization & Conservation Service v. Gerth*, 991 F.2d 1428, 1431 (8th Cir. 1993); and *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir. 1987), quoting *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83, 85 (Bankr.D.Neb. 1986). Collier notes that

to be eligible for setoff, both the mutual claim of the creditor and the debt of the debtor must have arisen prior to the commencement of the case. Claims arising after the commencement of the case lack the requisite mutuality for setoff because the post-petition trustee or debtor in possession is a different entity from the pre-petition debtor.

5 COLLIER ON BANKRUPTCY, ¶ 553.03[3][g][ii], at 553–48 (15th ed. rev. 1999). *See also Cooper–Jarrett, Inc. v. Central Transp., Inc.*, 726 F.2d 93, 96–97 (3rd Cir.1984); and *In re American Central Airlines, Inc.*, 60 B.R. 587, 590 (Bankr.N.D.Iowa 1986).

■■■ The claims of Seehousen and Herbst against the Debtor clearly arose pre-petition. A more difficult question is whether the obligations of Seehousen and Herbst to the Debtor arose pre-petition. Although courts in other jurisdictions have reached differing results as to when actions against partners accrue, *see Judiciary Tower, supra*, 175 B.R. at 818–19, it seems clear that the law of this Circuit, as articulated in *In re M. Frenville Co.*, 744 F.2d 332, 335–37 (3rd Cir.1984). *cert. denied sub nom. M. Frenville Co. v. Avellino & Bienes*, 469 U.S. 1160, 105 S.Ct. 911,

83 L.Ed.2d 925 (1985), settles the issue. Under *Frenville*, only claims which arose before the commencement of a bankruptcy case are pre-petition claims. Meanwhile, until at least the post-petition filing of the instant Proceedings, there was no "debt owing" to the Administrator. The deficiency claim was, moreover, not "mature" until the claims process became worked out during the course of this case. *Cf. In re CS Associates*, 156 B.R. 755 (Bankr. E.D.Pa.1993) (a § 723(a) action was found to have accrued only after a trustee was appointed and it was determined that a deficiency in fact existed). We therefore conclude that the alleged deficiencies at hand represent post-petition obligations that are not subject to a setoff by the Defendant Partners. *See In re Davidovich*, 901 F.2d 1533, 1538 (10th Cir.1990) ("pre-petition claim may not be offset against post-petition debt"); *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565 (7th Cir.1986) ("a post-petition claim cannot be offset against pre-petition debt because the two are not mutual"); and *In re Dartmouth House Nursing Home, Inc.*, 24 B.R. 256, 263 (Bankr. D.Mass.1982), *aff'd*, 1985 WL 17642 (D.Mass.1985).

Having considered and rejected all of the opposing arguments, we can only conclude that the Defendant Partners are indeed liable for all deficiency claims of the Debtor arising during or after the withdrawal of the partners from the Debtor. We therefore reject all of the arguments to the contrary articulated by Seehousen, Herbst, and Hilly. The only issues remaining to be resolved on the deficiency question are Cyr's unique objections to her particular liability and Stern's objections to the Administrator's calculation of the Debtor's deficiency. We next turn to these issues.

2. *Cyr Shares Liability with the Other Partners; However, She Is Not Liable For Claims Which Preceded Her Becoming a Partner of the Debtor.*

Cyr relies on 15 Pa.C.S. § 8329, and cites *CS Associates, supra*, 160 B.R. at

907; *Weisenberg v. Mount Royal Associates*, 446 Pa.Super. 384, 393–94, 666 A.2d 1103, 1107–08; and *Levy, supra*, 338 Pa.Super. at 83, 487 A.2d at 863, in support of the following arguments: (1) her liability is limited to partnership property; (2) the Administrator did not prove that the deficiencies at issue arose after her election to the partnership; and (3) even if these alleged deficiencies did indeed arise subsequent to her election, as an innocent party to all of the deficiency claims incurred, she is entitled to indemnification from the responsible partners.

Further, to the extent that we reject the preceding arguments, Cyr avers that she should not be treated as a general partner, but as a limited partner/employee. In support of this argument, Cyr observes that (1) she never was a member of the Debtor's executive or management committees; (2) she never made any decisions regarding the Debtor's operations; (3) she was compensated at a level consistent with that of only a senior associate/employee rather than that of a partner; and (4) she never participated in any of the significant decisions which created the instant deficiency claims. Then, Cyr cites *City of Wheeling v. Chester*, 134 F.2d 759, 762 (3d Cir.1943); and *Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F.Supp. 144, 147–49 (S.D.N.Y.1987), to support the conclusion that her alleged liability should be commensurate with her status as a "limited partner/employee."

 With respect to Cyr's contentions that she is not liable for claims which arose prior to her admission to the Debtor's partnership, we believe they are correct. PAUPA provides as follows:

**§ 8329. Liability of incoming partner**

A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when the obligations were incurred except that this liability

shall be satisfied only out of partnership property.

As the Superior Court noted in *Weisenberg, supra*, "[t]his provision was clearly designed to limit satisfaction of liability for any new partners who come into a partnership after the partnership has incurred an obligation." 446 Pa.Super. at 394, 666 A.2d at 1108. Application of that decision to the deficiency claims at bar results rather clearly in the conclusion that Cyr is not liable for deficiencies incurred prior to her admission to the partnership. There is no evidence that she expressly assumed liability for the same. *See CS Associates, supra*, 160 B.R. at 908; and *In re Miramar Mall Limited Partnership*, 152 B.R. 631, 633–34 (Bankr.S.D.Cal.1993) (general partner could not be held personally liable for partnership debts which predated his joining the partnership). Nonetheless, as noted earlier in our discussion at pages 287–300 *supra*, Cyr remains liable for all deficiency claims which arose *after* she was admitted to the partnership.

■■■■■ Cyr maintains that she was a general partner in name only and therefore should be treated for liability purposes as a limited partner/employee. We find no merit in this contention. Under Pennsylvania law, partners must be admitted *as* "limited partners" in order to achieve limited partner status. 15 Pa. C.S.A. § 8503. In addition, the status at issue requires the filing and execution of a certificate with the Pennsylvania Department of State and the delivery of an executed copy of the same to each limited partner. 15 Pa.C.S.A. §§ 8511, 8518.

■■■■■ Limited partners surrender the right to participate in the conduct of the partnership's business in exchange for limited liability. *See, e.g.*, 15 Pa.C.S.A. § 8523(b). *See also Kenworthy v. Hargrove*, 855 F.Supp. 101, 105 (E.D.Pa.1994); and *In re Estate of Hall*, 517 Pa. 115, 134, 535 A.2d 47, 56 (1987). If a limited partner participates in the control of the partnership's business, then the partner must be considered as a general partner and accordingly is subject to personal liability

therefor. *See* H. Thompson, *New Business Options in Pennsylvania: A Critical Analysis of the Pennsylvania Limited Liability Company and Limited Liability Partnership Act of 1994*, 57 U.PITT.L.REV. 129, 177 (1994).

■■■■■ In the trials of the Proceedings, Cyr never submitted any evidence or provided any testimony to demonstrate that she complied with any of the aforementioned statutory requirements. As a result, Cyr's contentions that she never was a member of the Debtor's executive and management committees; never made any decisions regarding the Debtor's operations; never participated in any of the significant decisions which created the instant deficiency claims; and was compensated at a low-level consistent with that of a senior associate/employee, cannot rebut the fact that she signed the Debtor's Amended and Restated Partnership Agreement as a general partner. Under Pennsylvania law, where parties intend to enter into a limited partnership, but fail to comply with the requirements of the Limited Partnership Act, the parties are treated as general partners as to third persons and creditors. *See Ruth v. Crane*, 392 F.Supp. 724, 733 (E.D.Pa.1975), quoting *Wisocki v. Howell*, 37 Pa. D. & C.2d 666 (Franklin Co.C.P.1965); and *In re Verses I*, 15 B.R. 48, 50 (Bankr.W.D.Pa.1981). In short, Cyr is, with the other Defendant Partners, liable for all of the deficiencies incurred subsequent to her joining the Debtor's partnership.

3. *The Partners, with the Exception of Cyr, Are Jointly and Severally Liable in the Determined Amount of $151,299 for the Debtor's Deficiency.*

We observed, at page 287 *supra*, that Stern alone has raised certain contentions with respect to the accuracy of the Administrator's calculation of the present deficiency of the Debtor for which the Partners are liable. A close scrutiny of the evidence and testimony presented at trial reveals, as Stern correctly points out in its brief, that the Administrator, through the use of unsubstantiated low collectability

estimates of the nonpartner litigation accounts received, the omission of any of the recoveries in the hourly fee case, and the failure to credit the proceeds forthcoming from the settling partners in reference to the Proceedings at issue from the calculations, has excessively calculated the deficiency at hand.

We do understand that, even at this late stage in the case, the target of the deficiency actually due is a moving one. We also recognize that this figure is quite substantial and probably will not be fully collected from all of the Defendant Partners, even collectively. We suspect that either bankruptcies or settlements with the Administration by the Defendant Partners will follow, and we note the difficulty of collecting judgments against partners who are married to nonpartner spouses. We therefore deem precision as not so significant that we are inclined to devote substantial resources to the calculation process. We believe, however, that we can and must improve on the Administrator's calculations.

Like Stern, we recognize that these calculations, even as revised, require us to accept many of the Administrator's figures on faith. The only revisions which we are inclined to make are the ones specifically argued by Stern or ones that are clearly appropriate to us in light of our knowledge of the case.

There is no apparent dispute concerning the Debtor's Liabilities. The Administrator recites the outstanding claims against the Debtor as follows:

Allowed claims

Non–Recourse

| | |
|---|---|
| 1818 Market—VEF, II, LLC | 875,049 |
| Liberty Property Limited Partnership | 426,567 |
| | 1,301,616 |

Recourse

| | |
|---|---|
| Other Allowed Claims | 471,960 |
| Claim No. 36 | |
| (City of Philadelphia) | 2,571 |
| Claim No. 50 | |
| (New York City) | 6,960 |
| Administrative Claims | 662,167 |
| Continental Casualty | 555,410 |
| | 1,699,068 |

Since the partners are only liable for a deficiency as to Recourse claims, the liabilities of the Debtor which must be satisfied total $1,699,068.

The most questionable entry in this ledger is the Administrative Claims figure. We do not know where it comes from and we observe that it is apparently contingent on the nature and success of negotiations and appeals by the Defendant Partners and other nonsettling parties in the future. As we noted at page 289 *supra*, the Defendant Partners themselves bear a significant responsibility for the large size of this figure. Given the tremendous number of hours expended in litigating difficult issues in this case and potentially to be expended in the future, the Administrator's figure does not appear to be excessive and will be accepted by us.

Stern does, however, vigorously contest the Administrator's calculations of the Debtor's assets. These are, as annotated by us, as follows:

| | | |
|---|---|---|
| 1. | Bank Balance | $413,600 |
| 2. | Marketable Securities | |
| | On-Site Sourcing Stock, ONSS, NASDAQ (59,000 shares @ 1.875) | 110,625 |
| 3. | Pending Settlements | |
| | Kirby File | 50,000 |
| | Coregis | 7,198 |
| | Nationwide Insurance Co. | 3,500 |
| | Maguir Insurance Co. | 3,083 |
| | | 63,781 |
| 4. | Judgments | |
| | A. Accounts Receivable | |
| | Gross Amount | 268,035 |
| | Collectability Reserve (% noncollectability ratio) | 89,235 |
| | B. Contingent and Hourly Fee | |
| | Contingency Fee Action Ryan, Brown 126,000 (under appeal) Hourly Fee Actions Springer (120,000), Neeson (120,000), Salmon (120,000) [Not counted because part of settlement] | 268,035 |
| | Fogelberg (331,468) Marshall Defendants (653,961) [Not counted because on appeal] | |
| | Net Amount | 89,235 |
| 5. | Other Assets | |
| | Equipment | 500 |
| | Total | $677,741 |

Stern disputes (1) the use of a two-thirds (⅔) noncollectability ratio with respect to the nonpartner accounts receivable judgments, claiming it should be no more than one-half (½) instead of two-thirds (⅔); (2) the omission of the Fogelberg and Marshall Defendants recovery: and (3) the omission of the sums realized in settlement with the settling partners, elsewhere disclosed as yielding the net amount of $625,246.00.

We agree with Stern's first objection. We accept Stern's alternative proposal of a fifty (50%) percent collectability estimate, and therefore we set our measurement of the nonpartner accounts receivable judgments at $134,017. We agree in part with Stern's second objection. As we noted in reference to a similar component of debtor assets in *CS Associates, supra,* 160 B.R. at 910, there is no basis to totally exclude the $985,429.00 sum which constituted the Committee's judgment against Fogelberg and the Marshall Defendants, *see Labrum VI,* 227 B.R. at 421, from the calculation of the instant deficiency unless and until Fogelberg and the Marshall Defendants prevail on appeal or are proven totally unable to make the required payments. *See Bell & Beckwith, supra,* 112 B.R. at 869, quoting *In re Lamb,* 36 B.R. 184, 189 (Bankr. E.D.Tenn.1983) (trustee simply needs to prove the minimum deficiency and make adjustments as they occur). We do note that all of the Marshall Defendants have filed bankruptcies and a recovery of any substantial sums from them is extended unlikely. However, Fogelberg has not filed bankruptcy and we have no reason to conclude that at least the $331,468 recovered against him will not be payable from him and should be included in part. We will, somewhat arbitrarily and charitably to the Defendant Partners, value the Fogelberg/Marshall Defendants recovery at $200,000.

We can conceive of no logical reason for the omission of the proceeds of approved settlements with the settling partners from the calculations of the instant deficiency. The settlements in question, which apparently resulted in a net recovery of $625,246, were in large part duly approved by our Order of June 23, 1999. Accordingly, these proceeds should be included as assets of the Debtor in the deficiency calculation at hand.

The calculation of the Administrator resulted in a deficiency of $1,021,327. By increasing the Debtor's assets by $870,028 from that found by the Administrator ($44,782 for the amounts receivable adjustment, $200,000 for the Fogelberg/Marshall Defendants adjustment, and $625,246 for the proceeds receivable from the settling partners), we calculate the total deficiency to be $151,299.00.

A judgment in this amount of $151,299.00 will therefore be entered in favor of the Administrator and against all the Partners except Cyr. Cyr is excepted because some of the allowed claims may have preceded February 1, 1993. We find it impossible to determine the exact sum for which Cyr is responsible on this record. We will direct the Administrator and Cyr to attempt to agree to the figure due in light of the instant calculations. Failing that, these parties are directed to submit their positions to us by August 10, 1999, in our attached Order effecting this Opinion.

4. *The Permanent Injunction Requested by the Administrator will Be Issued to Preserve the Settlements Reached With the Settling Partners and to Protect the Plan Administrator's Right to Collect the Deficiency from the Partners.*

Also at issue, in addition to the Administrator's rights regarding the deficiency claims against the partners addressed heretofore, is the question of whether an injunction to prevent further actions against the partners requested in both of

the instant Proceedings is necessary and appropriate under the instant circumstances. The determination of this issue requires interpretation of 11 U.S.C. § 105(a) of the Bankruptcy Code, the statutory basis of this claim, which reads as follows:

### § 105. Power of court

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. . . .

The starting point of the Administrator's request is ¶ 10.1(2) of the Plan which, while it does not provide for an injunction of the sort requested, does authorize this court "to enter any order, including injunctions, necessary to enforce the terms of the Plan." The Administrator is clearly the appropriate party to make the request for the injunction.

In invoking § 105(a), the Administrator relies on the principles set forth in such cases as *MacArthur v. Johns–Manville Corp.*, 837 F.2d 89, 93 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145, (1988) ( ["s]ection 105(a) . . . permits the Bankruptcy Court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title' "); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 685 (Bankr.D.D.C.1992) ("a bankruptcy court may enter a permanent injunction enjoining suits against non-debtor parties funding a plan of reorganization if the court finds that such injunction is essential to effectuate the plan of reorganization"); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 433 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 635 (S.D.N.Y.1991) ("pursuant to the 'broad power' vested in the bankruptcy court under Section 105(a) . . . an injunc-

tion . . . is appropriate and necessary to preserve this Court's jurisdiction to decide issues that are central to the administration of [the] estate"); *In re University Medical Center*, 82 B.R. 754, 755 (Bankr. E.D.Pa.1988) ("[t]he Bankruptcy Code can be utilized to broaden the scope of the stay beyond that to which it automatically extends by the terms of 11 U.S.C. § 362"); and *In re Monroe Well Service, Inc.*, 67 B.R. 746, 751 (Bankr.E.D.Pa.1986) ("bankruptcy courts have the power to restrain legal action by creditors of the debtor against non-debtor third parties"). The Administrator notes that similar injunctions were entered in favor of non-debtor partners of debtor professional partnerships in *In re Gaston & Snow*, 1996 WL 694421, at *1, *5 (S.D.N.Y. Dec. 4, 1996); *Heron, supra*, 148 B.R. at 686–90; and *In re Myerson & Kuhn*, 121 B.R. 145, 155–57 (Bankr.S.D.N.Y.1990).

Home counters by arguing that the Plan does not specifically provide for the injunctive relief currently being sought by the Administrator. In support of this contention, Home deems it significant that the injunction was neither voted on, considered, nor approved at the confirmation of the Plan and, therefore, the Administrator's request for such relief at this juncture is, in substance, nothing but an improper attempt to amend the Plan in contravention of 11 U.S.C. § 1127 of the Bankruptcy Code. Further, Home observes that none of the authorities cited by the Administrator presented a situation where an injunction in favor of nondebtor partners of a debtor professional partnership were sought or obtained after the plan of reorganization had been confirmed, as is the instant injunction. In making this latter argument, Home contends that none of these authorities would have granted the injunction at issue unless it were proven to have been an essential element of a plan. Further, Home asserts that the language contained in ¶ 10.1(1) of the Plan does not expressly allow this Court to grant the relief being sought.

As noted at page 287 *supra*, Seehousen and Cyr also oppose the entry of the injunction. In his submission, Seehousen appears to assume that such an injunction is unnecessary as to him because he also assumes that he has no deficiency liability. Thus, in his post-trial brief, Seehousen, apparently believing that the injunction would hamper him in asserting claims against the settling partners, maintains that the Administrator failed to make a case for the granting of the relief requested. Cyr states that, although she did not oppose the granting of the injunction at the trial of the Proceedings, she opposes it now in order to preserve her claims for indemnification and contribution against other partners to remedy any judgment which the Administrator has obtained against her. In light of the fact that the injunction would now benefit them by enjoining actions by creditors against them, Seehousen and Cyr may be inclined to change their positions.

 We believe that the authorities and instant circumstances clearly support the Administrator's position that entry of the requested injunction is indeed necessary and appropriate. Section 105(a) of the Bankruptcy Code grants the Court broad equitable power "to issue any order, process or judgment that is necessary or appropriate" to advance the bankruptcy proceedings and matters related to the proceeding. *See* S.REP. NO. 989, 95th Cong., 2d Sess. 51 (1978), reprinted in 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 5837; and H.R.REP. NO. 595, 95th Cong., 1st Sess. 341 (1977), reprinted in 1978 U.S.CODE CONG. & AD-MIN.NEWS 5963, 6298. *See also Monarch Life Insurance Co. v. Ropes & Gray*, 65 F.3d 973, 978–79 (1st Cir.1995); *Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 273 (3rd Cir. 1984); *MacArthur, supra*, 837 F.2d at 93; *In re Old Orchard Investment Co.*, 31 B.R. 599, 601 (W.D.Mich.1983); *Myerson & Kuhn, supra*, 121 B.R. at 154; and *In re AP Industries, Inc.*, 117 B.R. 789, 801–02

(Bankr.S.D.N.Y.1990). The powers granted to bankruptcy courts under this section are "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). *See also Katchen v. Landy*, 382 U.S. 323, 327, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *United States Nat'l Bank v. Chase Nat'l Bank*, 331 U.S. 28, 36, 67 S.Ct. 1041, 91 L.Ed. 1320 (1947); and *Pepper v. Litton*, 308 U.S. 295, 303–04, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

The law in reference to the use of § 105(a) to restrain legal actions by creditors of a debtor against nondebtor third parties has been articulated carefully and exhaustively by Judge Fox in *Monroe Well Service, supra*, 67 B.R. at 750–57. *See also In re Eagle–Picher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir.1992); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir.1992); *In re Energy Co-op., Inc.*, 886 F.2d 921, 929–30 (7th Cir.1989); *In re Lomas Financial Corp.*, 117 B.R. 64, 68 (S.D.N.Y.1990); *In re Codfish Corp.*, 97 B.R. 132, 135 (Bankr. D.P.R.1988); *In re Guy C. Long, Inc.*, 74 B.R. 939, 944 (Bankr.E.D.Pa.1987); *In re Diaconx Corp.*, 69 B.R. 343, 346–47 (Bankr.E.D.Pa.1987); and *In re Mac-Donald Associates, Inc.*, 54 B.R. 865, 867 (Bankr.D.R.I.1985).

 As we acknowledged in *University Medical Center, supra*, 82 B.R. at 757, in *Monroe Well Service*, "very reluctantly exercising [§ 105] powers," 67 B.R. at 747, Judge Fox granted an injunction of limited duration (30 days) to prevent lien creditors of purchasers of oil-well servicing from the debtor from enforcing their liens against the purchasers, thus preserving the debtor's sole source of income derived from its oil-well servicing duties. In the course of so doing, Judge Fox held, *id.* at 752–53, that § 105(a) could be a basis for extending relief to nondebtors if and only

if the moving parties satisfied the following four requirements:

[1] that there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize ... [2] ... there must be a reasonable likelihood of reorganization. [3] the court must balance the relative harm as between the debtor and the creditor who would be restrained. [4,] the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing social interests.

*See also In re Olympia Holding Corp.,* 161 B.R. 524, 528 (M.D.Fla.1993); *In re Stadium Management Corp.,* 95 B.R. 264, 268 (D.Mass.1988); *In re Costa & Head Land Co.,* 68 B.R. 296, 298 (N.D.Ala.1986); *In re Delaware River Stevedores, Inc.,* 129 B.R. 38, 42 (Bankr.E.D.Pa.1991); and *In re Landmark Air Fund II,* 19 B.R. 556, 559 (Bankr.N.D.Ohio 1982). *See also* 2 COLLIER, *supra,* ¶ 105. 02[1], at 105–9. An application of these factors to the facts at hand leads us to the conclusion that the Administrator is indeed entitled to the relief requested.

With respect to the first *Monroe Well Service* requirement, there is no doubt in our mind that, without the issuance of the injunction requested, the Debtor's estate would suffer imminent, irreparable harm. Strong policy considerations support this conclusion. The settlement agreements reached by the Administrator and the settling partners are an essential source of funding for the outstanding deficiencies at hand. Absent injunctive relief, several of the settling partners testified that they would not have had sufficient incentives to contribute the sums called for under the agreements, some of which the various settling partners indicated that they drew from otherwise-exempt entireties property. Furthermore, as the Administrator correctly points out in its brief, failure to grant the relief sought would undoubtedly result in, first, encouraging the filing of a multiplicity of actions by creditors and by

and between settling and non-settling partners. Any example of such litigation is the contribution and indemnity actions which Cyr referenced in her objections. These actions would not only be a burden to the judicial system, but would be extremely costly to the estate and to the parties themselves. Second, the result would likely be a disorderly and inequitable distribution of assets to creditors, contrary to the contemplation of the Bankruptcy Code and the partnership laws of Pennsylvania. Third, a further adverse result would be a substantial disruption of the settlement agreements that would fund part of the outstanding deficiencies owed out of the settling partners' otherwise exempt entireties property. The deficiency sum found due from the Defendant Partners ($151,299) is not nearly as large as the amount recovered from the settling partners in settlement of the deficiency claims against them ($625,246). It would therefore be very detrimental to all of the Debtor's Partners, including the intransigent Defendant Partners, to invalidate these agreements. Finally, frustrating the settlements would unquestionably increase significantly the risk of additional personal bankruptcy filings by the settling partners and ultimately, the Defendant Partners as well. The alternative, were the injunction denied, would also undoubtedly place the Debtor and other parties to such settlements in the untenable position of never having a "final" settlement because of possible collateral attack through the mechanism of a derivative suit. *See In re Gainesville Venture, Ltd.,* 159 B.R. 810, 812 (Bankr.S.D.Ohio 1993).

With regard to the second *Monroe Well Service* requirement, we believe that it is satisfied because, although the Plan is confirmed, its chances of successfully resolving all disputes surrounding the Debtor's affairs is greatly enhanced by the entry of the injunction. Home's argument that an injunction action against nondebtor partners is more appropriate in the early stages of a partnership bankruptcy is not

well-taken. A broad injunction entered pre-confirmation, or at any time when the case is young and the need for such an injunction is not yet firmly established and when creditors may not be sufficiently familiar with the case so as to effectively defend against it, is in no respects less objectionable than an injunction entered when the partnership bankruptcy has been pending for a considerable time and the need for such an injunction can accurately be measured.

We note that, at the final confirmation hearing of December 2, 1998, several of the parties objecting to confirmation of the Plan argued that the Plan should include an injunction similar to that now sought by the Administrator. We rejected the objectors, arguments on this issue, not because we believed that the entry of an injunction was entirely inappropriate, but because we believed that to do so in the context of plan confirmation would be unfair to creditors, who may not have had an opportunity to study that aspect of the Plan and who also should be accorded an opportunity of arguing that an injunction would be inappropriate as to them for any applicable reason. The instant Proceeding provided a clear opportunity to all creditors who might wish to sue the partners individually to defend against the injunction. It can be observed that Home is the only nonpartner creditor who has continued to object to the injunction at this point. In this light, we cannot accept any argument that the timing of the request for an injunction, which we insisted upon to protect creditors, should for that reason be denied. In sum, Home's argument that the late stage of this case militates against entry of an injunction is counterintuitive and lacks merit.

With regard to the third prong of the *Monroe Well Service* requirements, a comparison of the relative harm between the parties enjoined and the partners protected by the injunction leads us to support the injunction's issuance. As we already noted above, if the relief requested is not granted, the prospects for the continuing implementation and funding of the Plan are significantly adversely affected, which in turn adversely and significantly affects the Debtor, and the settling Defendants, and ultimately the creditors as well. By comparison, enjoining the creditors will cause relatively few adverse effects. The very fact that only Home, among the Debtor's many creditors, opposes the injunction, suggests in itself that creditors will suffer few significant adverse consequences therefrom. *See Monroe Well Service, supra,* 67 B.R. at 755; and *In re Dore & Associates Contracting, Inc.,* 54 B.R. 353, 358–59 (Bankr.W.D.Wis.1985) *See also Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

As to the fourth *Monroe Well Service* requirement, the issuance of the injunction requested advances the public interest. As noted by a sister bankruptcy court in *Heron, supra,* 148 B.R. at 685, the injunction being sought is consistent with the law governing the settling of accounts between partners in the dissolution of the partnership. *See* Pa.C.S. §§ 8331, 8334(a), 8352, 8358, 8362(4). *See also Wolgin v. Smith,* 1996 WL 355338, at *4 (E.D.Pa. June 21, 1996); *Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986); and *North Star Coal Co. v. Eddy,* 442 Pa. 583, 586, 277 A.2d 154, 156 (1971). By protecting the assets of the partners from contribution and other suits, the injunction at issue conserves the assets of the partnership available under state law to satisfy partnership debts. *See* 15 Pa.C.S. § 8362(1). Further, the injunction facilitates the payment of creditors in an orderly manner and preserves the nonpartner creditors' priorities over the partners. *See* 15 Pa. C.S. § 8362(2). If injunctive relief were denied, contribution and collection suits by the Defendant Partners, like that which Cyr, we believe most unwisely, indicated that she wishes to stir up, would disrupt the Plan's distribution scheme. *See* Article III of the Plan.

We note that, in the absence of injunctive relief, the creditors and the partners opposing this relief would be entitled to litigate their claims against their fellow partners. Thus, the superior rights granted to nonpartner creditors by the Plan over partner-creditors, *see Labrum V,* 227 B.R. at 376–79, would be denied to the non-partner creditors. *See In re Berlin,* 151 B.R. 719, 724 (Bankr.W.D.Pa.1993); and *In re Johnson,* 51 B.R. 220, 222 (D.Colo.1985). Such a result would be inconsistent with the overall thrust of the applicable state partnership law, which contemplates a priority of nonpartner creditors over partner creditors. *See* 15 Pa.C.S. §§ 8358, 8362; and *Labrum V,* 227 B.R. at 378.

As the evidence presented above shows, the Administrator has established each element of the four requirements enunciated by Judge Fox in *Monroe Well Service, supra,* 67 B.R. at 752–53. Accordingly, we conclude that entering the injunction requested is in the best interest of the Debtor's estate and its creditors, and will promote the orderly administration of this case, while continuing the implementation of the Plan in accordance with Chapter 11 of the Code. We therefore join the many courts which have considered the question of whether the scope of § 105(a) supports such relief before us in similar circumstances and have held that bankruptcy courts do indeed have the power to restrain legal actions by creditors of a partnership debtor against nondebtor partners. *See Drexel Burnham, supra,* 960 F.2d at 292; *Energy Co-op., supra,* 886 F.2d at 929–30; *Heron, supra,* 148 B.R. at 687; *In re Laventhol & Horwath,* 1992 WL 88184, at *2 (S.D.N.Y.1992); *AP Industries, supra,* 117 B.R. at 801–02; *Codfish, supra,* 97 B.R. at 135; and *Monroe Well Service, supra,* 67 B.R. at 751.

Accordingly, the few objections to the issuance of the injunction requested will be overruled and the injunction, as requested by the Administrator, will be entered.

5. *We Deem It Unnecessary to Rule on the Objections to the Proofs Of Claim Filed by the Partners Because There Appears No Possibility that Their Claims Will Be Paid.*

Also at issue are the Administrator's Objections to the various proofs of claim filed by the Defendant Partners. At the outset, we note that all of the settling partners have agreed to withdraw their proofs of claim as aspects of their settlements. The Defendant Partners who have not settled, at least at this juncture, and Wright assert the following claims:

| CLAIM NO | CLAIMANT | AMOUNT |
|---|---|---|
| 10 | Kevin Wright | 148,768.94 |
| 16 | John Seehousen | 138,132.97 |
| 48 | Jonathan Herbst | 128,000.00 |
| 66 | Leslie M. Cyr | 18,840.00 |
| 91 | Robert J. Stern | 50,229.13 |
| 139 | Kevin Wright | 148,768.94 |
| 140 | Kevin Wright | 148,768.94 |

It can be easily seen that Wright has filed the same claim three times. Two of these claims can clearly be stricken as triplicates of the same claim.

It is also clear that every one of these claims has been filed by parties defined in the Plan as partners or former partners of the Debtor. Once we denied the motion of Seehousen and Herbst to "correct" the priorities established in the Plan, on May 19, 1999, *see* pages 285–286 *supra,* which effectively subordinated partners' claims to those of nonpartners, we effectively relegated all of these claims to a status where they would be paid only if the deficiency owed to nonpartners were entirely satisfied.

The Deficiency Proceeding contemplated a judgment against the partners which would be sufficient to satisfy only the classes containing nonpartner creditors' claims, not the classes of partners and former partners in addition. The amount of the deficiency is calculated on that assumption. It would be inconsistent to fix the deficiency at an amount not including the claims of partners and former partners, and then proceed to enter orders

allowing the claims of partners and former partners. Moreover, except in the case of Wright, who is not a defendant but could probably be added as a defendant on the basis of the reasoning set forth at pages 287–300 *supra,* all of the partner claimants are also parties liable for the deficiency judgment, and, except for possibly Cyr, they are liable for the entire deficiency. Rather than requiring the Defendant Partners to pay themselves, we will keep the deficiency amount where it is and simply not rule on the Objections because there is no practical reason to do so.

We acknowledge several arguments by the Administrator which would require us to disallow the claims in any event. The first is invocation of 11 U.S.C. § 502(d), which provides as follows:

> (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

Utilizing reasoning similar to that which we articulated in the foregoing paragraph, the Administrator argues basically that the Partners' outstanding deficiency liability mandates disallowance of their claims as a matter of law, a ruling which would embrace all but the remaining single claim of Wright.

We cannot agree with this argument of the Administrator. This argument interprets § 502(d) as requiring the disallowance of the claims of any entities against which a debtor or its representatives have any sort of judgment. However, by its terms, § 502(d) is limited in its effect to claimants subject to avoidance orders under certain specific sections of the Code.

*See* 4 COLLIER, *supra,* ¶ 502.05[1], at 502–59.

The Administrator also argues, with some force, that none of the claimants have presented sufficient evidence to meet their burdens of proving their claims on their merits. We recently articulated the law setting forth the relative burden of proof of the objector and the claimant in claims litigation as follows in *In re Giordano,* 234 B.R. 645, 650 (Bankr.E.D.Pa.1999):

> In litigation involving objections to proof of claim, once the objector presents evidence disputing any aspect of the claim, the claimant must prove facts sufficient to support the challenged aspect of the claim. As stated in [*In re*] *Galloway, supra,* 220 B.R. [236,] at 243–44 [ (Bankr.E.D.Pa.1998) ],
>
> > "[u]pon filing an objection, the Debtor bears the burden of going forward and presenting evidence to rebut or cast doubt upon, the creditor's proof of claim. The Debtor's burden is to produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim ... by a preponderance of the evidence."

*See also In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992); and *In re Lewis,* 80 B.R. 39, 40 (Bankr.E.D.Pa. 1987).

At the hearing of May 5, 1999, the Administrator presented the testimony of George L. Miller, its expert accountant, who contended that the claimants of the proofs of claim at issue failed to attach any evidence of the alleged debts owed by the Debtor to the Defendants; the amounts listed in the claims were not consistent with the Debtor's books and records; and that many of the claims were for return of capital of the Debtor, which must be disallowed because no such capital exists.

Perhaps sensing the futility of this claims litigation, the Defendant Partners and Wright presented little evidence supporting their respective claims. Herbst briefly recited the basis of his claim, which was supported by an arbitration award. Seehousen very briefly summarized the nature of the claims of himself and of Wright. Neither Cyr nor Stern were present. In her post-trial brief, Cyr claimed a lack of notice to her of the pendency of the Objections or of the hearing thereon. This is an argument which, were Cyr to file a successful motion asserting "excusable neglect" for her absence, might give her a basis to present evidence in defense of the Objections. *But see Brielle Associates v. Graziano,* 685 F.2d 109, 110 (3d Cir.1982); *In re Giordano,* 1999 WL 527717 (Bankr. E.D.Pa. July 20, 1999); *In re O.W. Hubbell & Sons, Inc.,* 180 B.R. 31, 33 (N.D.N.Y.1995); and *In re JWP Information Services, Inc.* 231 B.R. 209, 210 (Bankr.S.D.N.Y.1999) ("excusable neglect" to allow reopening of evidentiary records made on objections to claims not found). Moreover, we note that Cyr also failed to attend the trials at which the rescheduling of the hearings on the Objections was constantly reiterated, and hence it would have been very difficult for her to have proven that her neglect was "excusable."

In any event, except for an order striking two of Wright's three triplicate claims, we will enter an order stating that, at this juncture, we perceive no basis for ruling on the merits of the Objections one way or the other.

## D. *CONCLUSION*

An order which we believe is consistent with the legal conclusions which we have reached in this Opinion follows.

### *ORDER*

AND NOW, this 3rd day of August, 1999, after trials of Adversary No. 99–0083 ("Adv. 83") on April 21, 1999, and April 23, 1999, and of Adversary No. 99–0082 ("Adv. 82") on May 19, 1999, and hearings on various Objections ("the Objections") of the Plan Administrator ("the Administrator") to proofs of claims of partners in the main bankruptcy case on May 5, 1999, and upon consideration of the various post-trial submissions of the several interested parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Administrator in Adv. 82 and against the Defendants thereto to the extent that they continue to oppose same.

2. Each and every one of the above-captioned Defendants in Adv. 82, and their respective employees, attorneys, agents and representatives, are enjoined and restrained from (a) commencing, maintaining or prosecuting any action or litigation against any of the current or former Partners of the Debtor identified as Defendants in this action, arising out of, relating to, and/or in connection with claims based upon (i) services performed by and/or on behalf of the Debtor, or (ii) the Partners alleged liability for obligations of the Debtor (collectively, the "Partnership Claims"); and/or (b) attaching, seizing, garnishing, foreclosing or otherwise executing upon assets or property of any of the Partner Defendants as a result of any Partnership Claims.

3. Judgment is also entered in Adv. 83 in part in favor of the Administrator and against Defendants LESLIE M. CYR, CARL R. FOGELBERG, JONATHAN HERBST, JAMES D. HILLY, JOHN D. LUCEY, JR., JAMES M. NEELEY, JOHN J. SEEHOUSEN, and ROBERT J. STERN ("the Partners").

4. It is declared, and judgment is entered, that the Partners, with the exceptions of Cyr, are liable to the Administration for deficiency claims on account of their status as partners or former partners of the debtor in the amount of $151,299.00.

5. The Administrator and Cyr are directed to attempt to fix the deficiency liability of Cyr in accordance with the principles articulated in the foregoing Opinion.

If they fail in their efforts to do so, each of these parties shall, and any other interested parties may, file and serve a calculation of this liability on or before August 10, 1999.

6. No ruling is made on the Objections except that claimant Wright's triplicate Claims No. 139 and 140 are STRICKEN.

7. A status hearing is scheduled, to be attended by the Administrator and the United States Trustee, to consider the nature and status of any appeals or matters in this court which are outstanding and to establish a bar date for filing any additional fee applications and a plan implementation hearing on

WEDNESDAY, AUGUST 11, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

8. The original copy of the submissions pursuant to paragraph 5 *supra* shall be filed with the Clerk of this Court and copies sent to opposing counsel and delivered to the Court on or before 3:30 P.M. on August 10, 1999, at the following address:

David A. Scholl, Bankruptcy Judge
900 Market Street, Suite 201
Philadelphia, PA 19107